# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID M. RUSSELL,           )
      Plaintiff,           )
                      v.           )    Civil Action No. 08-158 Erie
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,           )
      Defendant.           )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

      Plaintiff, David M. Russell, commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security, who found that he was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Plaintiff filed an application for DIB on February 3, 2005, alleging that he was disabled since November 15, 2000 due to right shoulder and neck injuries, diabetes, and depression (Administrative Record, hereinafter "AR", at 74).  His application was denied and Plaintiff requested a hearing before an administrative law judge ("ALJ") (AR 24-28).  A hearing was held on March 13, 2007 and following this hearing, the ALJ found that Plaintiff was not disabled at any time through the date of his decision and therefore was not entitled to DIB benefits (AR 14-23;605-33).  Plaintiff's request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the Court are cross-motions for summary judgment.  For the reasons set forth below, I will deny the Plaintiff's motion and grant the Defendant's motion.

## I. BACKGROUND

      Plaintiff was born on March 13, 1954 and was fifty-three years old on the date of the ALJ's decision (AR 610).  He received a high school education (AR 610).  His past relevant work experience was as a highway maintenance worker and as a heavy machine operator (AR 21, 613).  Plaintiff had received a CDL license (AR 614).

      In September 1999, Plaintiff injured his right shoulder while at work (AR 87).  Plaintiff was diagnosed with impingement syndrome and arthritis in the shoulder joint by Lawson C. Smart, M.D (AR 87).  Beginning in November 1999, Plaintiff received nerve block injections to

1

the shoulder from Robert Concilus, M.D., a pain management specialist. These injections continued through 2003 (AR 111, 113, 116, 117, 119, 121, 125, 127, 129, 131, 134, 135, 137, 139, 141, 143, 147, 151, 344, 347, 346, 348, 349, 350, 352, 353, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366). Plaintiff reported that the injections provided some relief of his shoulder pain (AR 111, 354, 356).

On January 25, 2000, Plaintiff underwent a psychosocial evaluation assessment with Marilyn Antoun, M.A., a pain management specialist. Ms. Antoun indicated that the Plaintiff was suffering from affective changes due to his injury and financial and family stressors (AR 209-210). Despite his injury, Plaintiff indicated that he continued to work driving a snowplow for PennDot (AR 209). In her treatment plan, Ms. Antoun indicated that Plaintiff needed anger management education, and indicated that she would speak with Dr. Concilus about putting him on antidepressant medication (AR 211). At sessions with Ms. Antoun in February and March of 2000, Plaintiff discussed anger management techniques (AR 207-208). In April 2000, Plaintiff reported improvement at home and more effective use of anger/frustration strategies (AR 206).

Plaintiff underwent shoulder surgery in April 2000 to reduce impingement from his injury (AR 87, 90, 227). The surgeon noted that his post-operative course was uneventful (AR 87).

In a post-surgery June 2000 session with Ms. Antoun, Plaintiff reported increased pain levels, problems with medication, zero tolerance for frustration, trouble remembering and organizing things and conflict with his wife (AR 205). He was placed on Prozac (AR 205). On June 28, 2000, Plaintiff's wife indicated that Plaintiff's anger management strategies had improved overall (AR 204). In July 2000, Plaintiff indicated that he was having some "wild thoughts," but denied suicidal ideation (AR 203). He also indicated that he had an overall reduction in pain as his physical therapy continued and he had been cleared to perform light work (AR 203).

In August 2000, Plaintiff reported to Ms. Antoun that his Prozac was causing a decrease in libido and some diarrhea (AR 202). At this session, Plaintiff was hyper and agitated, but indicated that he had taken a caffeine tablet earlier in the day. He admitted to experiencing some

"wild thoughts" but could not give examples and reported that none of the thoughts were suicidal (AR 202). At a session in September 2000, Plaintiff indicated that he was placed on Wellbutrin (AR 199). He complained of increased sleep interruptions, but Ms. Antoun indicated "more appropriate affect" and "some improvement" (AR 199).

At his October 2, 2000 pain management session the Plaintiff continued to complain of pain, but exhibited an increased range of motion (AR 198). Beginning in October 2000, Plaintiff also began group therapy sessions for pain management that lasted through January 26, 2001 (AR 181, 186, 187, 188, 190, 191, 193, 196). On November 8, 2000, Plaintiff complained of increased depression symptoms to Ms. Antoun (AR 192).

On November 16, 2000, Plaintiff's doctor cleared him for full-time light duty work (AR 273). An MRI of Plaintiff's shoulder in December 2000 indicated that he had severe tendonitis, possible subluxation of the long head of the biceps and degenerative changes and mild impingement of the muscle (AR 272). Despite these findings, a second clearance for light work was issued on December 4, 2000 (AR 270).

On December 14, 2000, Plaintiff reported at his therapy session that he had begun to experience intense headache pain and indicated that he believed his headaches were stress related (AR 185). Plaintiff had a normal chemical stress study of his heart on January 1, 2001[1] (AR 342). In early 2001, Plaintiff was also diagnosed with diabetes, which he decided to control with hypoglycemics and weight loss (AR 129).

A second surgery was scheduled for Plaintiff's shoulder due to a rotator cuff tear, which Plaintiff reported was postponed due to headaches that he related to removing ice and snow from the roof of his home (AR 182). On January 31, 2001, Plaintiff indicated that he significantly reduced his caffeine intake, which made him feel less "revved up" (AR 180). Plaintiff indicated a reduction in the number and the intensity of his headaches on February 12, 2001 (AR 179). However, Plaintiff reported sleep interruptions and recurrence of nightmare activity in late February (AR 178).

---

[1] Plaintiff suffered a myocardial infarction on September 1, 1994. At this time, he was diagnosed with hypertension. (AR 326).

3

On March 27, 2001, Vincent J. Paczkoskie performed a second shoulder surgery on Plaintiff to repair his rotator cuff tear (AR 92, 97-98). On April 2, 2001, Plaintiff denied any severe depression or suicidal ideation in his session with Ms. Antoun (AR 175). On May 14, 2001, Plaintiff continued to report sleep interruption despite the use of Trazadone (AR 173). An MRI of Plaintiff's shoulder on May 22, 2001 indicated possible supraspinatus tendinitis and the possible necessity of a third exploratory surgery (AR 269, 261). Plaintiff reported a significant amount of discomfort to Dr. Paczkoskie at a follow-up appointment on May 31, 2001 (AR 261).

Plaintiff requested a change of antidepressants on May 24, 2001, but Ms. Antoun reported that Plaintiff was not complying with the antidepressant he had been taking (AR 172). At his June 28, 2001 session, Plaintiff reported increased neck pain and headache episodes and had stopped taking medications that he could not afford, but remained on his Zoloft (AR 170).

On July 13, 2001, Plaintiff reported that he was helping his father and taking his children to activities that they needed to attend. He also reported receiving assistance from a free clinic for his medications (AR 169). In August 2001, Plaintiff indicated that he was more active socially, which removed the heaviness he felt when being isolated, and had lost weight to control his blood sugar (AR 168). Dr. Paczkoskie also indicated that Plaintiff had significant improvement in his shoulder symptoms (AR 254). In September 2001, Plaintiff reported that he drove his wife to her physical therapy sessions, worked in his garden, and helped his father with small projects (AR 167). On October 22, 2001, Plaintiff reported that his pain was at a four out of ten (AR 165).

On November 5, 2001, Dr. Paczkoskie released Plaintiff for light work full-time, indicating that his strength and motion had improved significantly (AR 269, 235). On November 16, 2001, Plaintiff reported that his pain level was at a three out of ten (AR 164). Plaintiff reported that he felt he was capable of medium duty work as far as his tasks, but only "low duty" ability due to his physical limitations (AR 164). On November 30, 2001, Ms. Antoun indicated that Plaintiff had a brightened affect, better posture and had lost more weight (AR 163). Plaintiff indicated that he had played Santa at an event and had discussed adopting a child with disabilities with his wife (AR 163).

On December 27, 2001, Dr. Paczkoskie indicated that he felt Plaintiff was a good light duty candidate, but had tested with a residual functional capacity of medium duty work (AR 235). Dr. Paczkoskie also reported that Plaintiff had good symmetric motion and good strength, but had pain with impingement testing (AR 234). Plaintiff reported that he drove his wife to her part-time job and helped her at that job, and drove his children to activities (AR 162). On February 20, 2002, Plaintiff reported having gone out of town to help his brother with a business venture in Michigan (AR 160).

On February 21, 2002, Plaintiff was seen by Martin Decker, D.O. and reported high blood sugar and constant neck pain and stiffness (AR 282). Plaintiff had previously been diagnosed with cervical facet arthropathy of the neck by Brian Dalton, M.D., a neurosurgeon, but it was indicated that this condition was stable and that Plaintiff would only need to return to Dr. Dalton if surgery were indicated (AR 561, 565). Upon examination, Dr. Decker made no abnormal findings with respect to Plaintiff's neck (AR 284).

On April 18, 2002, Plaintiff continued to report discomfort in his shoulder despite full range of motion and good strength (AR 232). Dr. Paczkoskie recommended a third shoulder surgery to explore residual impingement (AR 232). In May 2002, Plaintiff reported that he was having difficulty carving out time to start and complete the many projects that he wanted to do at his home because he was spending significant time driving his wife around and tending to his children (AR 158).

A third arthroscopic surgery of the shoulder was performed on June 12, 2002 (AR 226-272).[2] On July 8, 2002, Plaintiff was released for sedentary work full-time (AR 217). Plaintiff reported a higher level of activity overall, especially out of doors, on the same date (AR 154). On August 12, 2002, Plaintiff reported to his physical therapist that he was able to operate a bulldozer and drive a dump truck (AR 220). He also had full range of motion passively, but pain with rotation (AR 220).

On August 14, 2002, Dr. Decker reported that Plaintiff was complaining of fatigue and

---

[2] A June 7, 2002 record indicates an arthroscopic procedure of the right knee. This record, however, is that of a Robert R. Russell and not that of Plaintiff. (AR 224-25).

5

ringing in his ears. Dr. Decker noted that Plaintiff's diabetes was stable (AR 286). Plaintiff returned to Dr. Dalton in October 2002 to discuss neck surgery, however, Dr. Dalton indicated that Plaintiff would need to stop using tobacco products for a significant period of time before surgery could be considered (AR 558). At a follow-up appointment for his shoulder on October 17, 2002, Plaintiff exhibited a full range of motion and some residual discomfort due to impingement (AR 216). Dr. Paczkoskie indicated that Plaintiff could perform light work, but would not be capable of returning to full-duty heavy work (AR 216, 219). On December 9, 2002, Plaintiff had full range of motion, but reported numbness in his arm (AR 321). Dr. Paczkoskie opined that Plaintiff was still at a light duty status (AR 321).

On December 10, 2002, Dr. Decker reported that Plaintiff had no complications with his diabetes, but was experiencing ringing in his left ear (AR 289-291). Dr. Decker similarly reported no complications with Plaintiff's diabetes or hypertension on June 13, 2003 (AR 292-294). A chest x-ray on June 6, 2003 showed mild degenerative changes to the thoracic spine (AR 335).

On April 20, 2003, Roger Glover, Ph.D. reviewed the Plaintiff's records and completed a psychiatric review (AR 377-391). Dr. Glover found that the Plaintiff's mental impairment was not severe (AR 377). He concluded that the Plaintiff had only mild limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (AR 387).

On May 11, 2003, Dr. Decker indicated that Plaintiff was not experiencing any complications from his diabetes or hypertension (AR 303). On February 16, 2004, Plaintiff returned to Dr. Paczkoskie, who indicated that although the Plaintiff continued to complain of pain, he did not recommend further surgery (AR 213). Plaintiff's rotator cuff was intact and other than postoperative adhesions, there was no other significant pathology (AR 213). Dr. Paczkoskie placed Plaintiff at the light duty level of work (AR 213).

Plaintiff's diabetes was reported as well-controlled on February 11, 2005 (AR 304-06). On March 2, 2005, Plaintiff underwent a stress test ordered by Dr. Decker (AR 315). The stress test indicated an interfolateral ST depression that was highly suspicious of coronary ischemia

(AR 315). Plaintiff was referred to Paul Kang, M.D. for follow-up, who ordered a nuclear perfusion study, which was negative for ischemia (AR 326). No murmur was noted on examination (AR 326). It was reported that Plaintiff was being treated medicinally for his coronary artery disease with Crestor, Niaspan, and Tricor (AR 327).

On April 5, 2006, Dr. Dilip Kar performed a Physical Functional Capacity Assessment based on Plaintiff's records (AR 367-376). Dr. Kar opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds (AR 368). He further opined that the Plaintiff could stand and/or walk six hours in an eight-hour work day, sit six hours in an eight-hour work day and was unlimited in his ability to push and pull (AR 368). Dr. Kar reported no further limitations (AR 369-373). On October 6, 2006, Dugarani Chadalwada, M.D., Plaintiff's new family physician, reported that Plaintiff was not experiencing any difficulties with his diabetes or hypertension (AR 600). This finding was repeated on October 31, 2006 (AR 593).

Plaintiff and Alina Kurtanich, a vocational expert, testified at the hearing held by the ALJ on March 13, 2007 (AR 605-633). Plaintiff testified that he had worked for PennDot until 2000 (AR 610-611, 614). He also testified that since filing for benefits, he had worked as a deliveryman for a pharmaceutical company for four and one half months in 2006 and part-time running a loader for his brother for six to eight months in 2003, and possibly other times (AR 611-613). Plaintiff claimed that pain in his neck and shoulders and headaches prevented him from working (AR 615-616). He claimed he suffered from headaches every other day and treated them with extra strength Tylenol or Oxycontin that he borrowed from his father who had been prescribed the medication (AR 616, 626). He denied suffering from any heart problems or blood sugar issues at the time of the hearing (AR 616-617). He further denied having any mental or emotional problems, and was on Paxil, which kept him "pretty mellow" (AR 617). Plaintiff testified that he took Reloquin at night because of his legs (AR 624).

Plaintiff claimed that he could only walk 950 feet or the length of his driveway before he had to relax due to neck pain (AR 618). He indicated that he used a four wheeler to retrieve his mail, could only stand for one half hour before needing to sit down and could sit for one hour at a time (AR 618-619). Plaintiff testified that the maximum amount of weight he could lift was

7

twenty pounds (AR 620). Plaintiff reported that he could do the dishes and cook, but could not carry a laundry basket (AR 621). He testified that he and his wife occasionally went to the movies and went out every Friday night to karaoke (AR 621). Plaintiff indicated that his overall condition was the same, but that his neck was worse and he also suffered from ringing ears (AR 622). Plaintiff also indicated that he had numbness in his fingers when he drove a lot (AR 623).

The ALJ asked the vocational expert to assume an individual of the same age, education, and work experience as Plaintiff, who was limited to light work that did not require climbing, crawling, balancing, did not require repeated overhead reaching, involved no constant pushing or pulling against resistance and no high stress work, defined as no high quotas or close attention to quality production standards (AR 627). The vocational expert testified that Plaintiff could work as a ticket taker, order caller, and electronics worker (AR 627-628). The vocational expert further testified that Plaintiff could work as a credit checker, ticket checker, or information clerk at the sedentary level (AR 628). The later jobs could be done with a sit/stand option (AR 628). The vocational expert also testified that an employer would not tolerate more than three absences per month or extra breaks during the day (AR 629).

Following the hearing, the ALJ issued a written decision which found that the Plaintiff was not entitled to a period of disability or DIB within the meaning of the Social Security Act (AR 14-23). His request for review by the Appeals Council was denied, rendering the ALJ's decision the final decision of the Commissioner (AR 5-10). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see Richardson v. Parales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United*

*States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S.137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

*Jesurum,* 48 F.3d at 117. In the instant case, the ALJ found that Plaintiff had the following severe impairments: right shoulder impingement syndrome status post rotator cuff surgery, cervical facet arthropathy, depression, diabetes mellitus, and a history of coronary artery disease (AR 16). He determined at step three that his impairments did not meet or equal the criteria of any of the listed impairments (AR 16-17). The ALJ found that the Plaintiff was able to perform work at the light exertional level with no climbing, crawling or balancing or pulling against resistance. He also found that the Plaintiff would be unable to perform high stress work, defined as work involving high quotas or close attention to quality production standards (AR 17). At the final step, the ALJ concluded that Plaintiff could perform jobs that existed in significant numbers in the national economy (AR 22). The ALJ additionally determined that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (AR 19). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first challenges the ALJ's determination that he did not meet any of the severity thresholds for the Listed Impairments under the Social Security Act ("SSA"). Plaintiff does not specify which Listings he believes he met and instead lists ten medical issues that he argues were supported with sufficient severity in the record to meet the Listings: chronic/severe cervical neck pain from degenerative disc disease, herniated discs C5/C6, C6-C7; chronic/severe right shoulder pain post three surgeries; chronic pain, tingling, numbness bilateral upper extremities; affective disorder; coronary artery disease, hypertension; diabetes mellitus type 2; chronic headaches; left ear tinnitus; overuse of left shoulder; and internal derangement right knee. *See* Plaintiff's Brief pp. 10-11. The record reflects that the ALJ considered the musculoskeletal Listings 1.00-1.08, Listing 4.04 for ischemic heart disease, Listing 9.08 for diabetes mellitus, and Listing 12.04 for affective disorders (AR 16-17).

With respect to the musculoskeletal Listings, 1.00-1.08, the ALJ determined that "none of the medical findings concerning the claimant's impairments meet or equal the criteria for severity in any of those listings" (AR 17). To meet a musculoskeletal Listing, Section 1.00 indicates that an individual must generally exhibit, "the inability to ambulate effectively on a sustained basis for any reason...or the inability to perform fine or gross movements effectively on a sustained basis for any reason." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00 (B)(2)(a). Section 1.00 defines the inability to ambulate effectively as "the inability to walk....without the use of a hand-held assistive device." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00 (B)(2)(b)(1). For the upper extremities, the inability to perform fine and gross movements effectively is defined as "extreme loss of function to both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00 (B)(2)(c). The inability to ambulate effectively or the inability to perform fine or gross movements must last twelve months or be expected to last twelve months. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00 (B)(2)(a).

None of Plaintiff's medical records indicate that he suffered from either of these difficulties related to any issues with his knee, neck, back or shoulders for a period of twelve months or more. Before his first shoulder surgery, but after his injury, Plaintiff continued to drive a snowplow for PennDot (AR 209). Plaintiff had his first surgery in April 2000 and

reported that he had increased range of motion by October 2000 (AR 87, 198). Seven months after his surgery in November, Dr. Lawson cleared Plaintiff for full time light duty work (AR 273). A second work release was issued in December 2000 despite an MRI indicating continuing tendinitis (AR 270, 272). In January 2001, Plaintiff indicated that, despite complaints of shoulder and neck pain, he was removing snow and ice from the roof of his home (AR 182).

Dr. Paczkoskie performed a second shoulder surgery in March 2001 (AR 92). By September 2001, Plaintiff was working in his garden and helping his father with small projects (AR 167). Eight months after his surgery in November, Plaintiff was cleared for light work full-time (AR 269). In December, Plaintiff tested with the ability to perform work at the medium level and Dr. Paczkoskie continued to indicate that he was capable of light duty work as he had good symmetric motion and good strength (AR 235). Plaintiff also reported that he was helping his wife at her part-time job (AR 162).

Dr. Decker reported no abnormal findings with regard to Plaintiff's neck in February 2002 (AR 284). Plaintiff had good range of motion and good strength in his shoulder in April 2002 (AR 232). A third surgery was performed in June 2002 and Plaintiff was released for sedentary work by Dr. Paczkoskie the following month (AR 217). By August, Plaintiff reported that he could operate a bulldozer and drive a dump truck and had a full range of motion (AR 220). Plaintiff discussed getting neck surgery with Dr. Dalton in October 2002, but as of the date of the hearing, had not undergone surgery (AR 286, 622). In October 2002, Dr. Paczkoskie reported that Plaintiff had a full range of motion and could perform light work (AR 216).

A chest x-ray in June 2003 showed only mild degenerative changes to the thoracic spine (AR 213). A follow-up with Dr. Paczkoskie in 2004 indicated that Plaintiff's rotator cuff was intact and that there was no other significant pathology in his shoulder (AR 213). Dr. Paczkoskie again opined that the Plaintiff was capable of light work (AR 213). Finally, Dr Kar, a state agency reviewing doctor, opined that Plaintiff was capable of lifting ten pounds frequently and could stand and/or walk for six hours in an eight hour day while experiencing, at most, mild limitations in functioning (AR 267-376). No medical evidence in the record from the alleged onset date of November 15, 2000, to Plaintiff's date last insured, September 30, 2006,

indicates that Plaintiff was suffering from any knee-related impairment. The remaining listed physical symptoms do not correspond to a specific Listing, but were listed as symptoms of Plaintiff's back, neck, and shoulder complaints. Based on the medical evidence and the evaluation of the state agency doctor, I conclude that the ALJ's finding that the Plaintiff did not meet a listing for a musculoskeletal impairment under the SSA is supported by substantial evidence.

Plaintiff was also evaluated under Listing 4.04, ischemic heart disease, and 9.08, diabetes mellitus, for his coronary artery disease and diabetes (AR 17). The ALJ stated that "claimant's coronary artery disease and diabetes are well-controlled and do not result in the frequency or severity of symptoms" to meet a Listing (AR 17). Listing 4.04 requires "symptoms due to myocardial ischemia." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.04. Listing 9.08 requires diabetes mellitus with:

> A. *Neuropathy* demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
>
> B. *Acidosis* occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $pCO_2$ or bicarbonate levels); or
>
> C. *Retinitis proliferans;* evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.08.

Plaintiff suffered a myocardial infarction in 1994 before his alleged onset date and was diagnosed with diabetes in early 2001 (AR 129, 326). Plaintiff had a normal chemical stress test of his heart in 2001 (AR 342). No complications were reported with Plaintiff's hypertension (AR 292-294, 303). A stress test in 2005 was suspicious of coronary ischemia, but follow-up testing was negative for ischemia and no murmur was noted (AR 326). The records indicate that Plaintiff successfully controlled his heart ailment with medication (AR 327, 617). Additionally, Plaintiff's records indicate that he did not experience any complications from his diabetes and that it was well-controlled (AR 286, 292-294, 303, 304-06, 600). Substantial evidence supports the ALJ's conclusion that the Plaintiff did not meet Listing 4.04 or 9.08.

Finally, I will address Plaintiff's argument that the ALJ erred in determining that his mental impairments failed to meet Listing, 12.04, Affective Disorders. The Listing consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (A). The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

The paragraph B requirements of Listing 12.04 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 
> 2. Marked difficulties in maintaining social functioning; or
> 
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
> 
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P. App. 1 §§ 12.04(B). The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with the claimant's ability to "function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C. The ALJ found that Plaintiff's affective disorder did not meet part B because the evidence reflected only mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation (AR 17).

Plaintiff has not pointed to specific evidence in support of his argument that he suffers from marked limitations in at least two of the necessary categories. *See* Plaintiff's Brief, p. 11. Plaintiff received counseling from a pain management specialist from early 2000 to late 2003. Ms. Antoun indicated that Plaintiff suffered from anger management issues and affective changes (AR 204, 209-210). However, after the initial session, improvement was noted in these areas on several occasion (AR 163, 199, 206, 211). Plaintiff took his children to their activities and assisted his father (AR 158, 162, 167, 169). He also drove his wife to work and physical therapy (AR 158, 167). He testified that he could wash the dishes and cook (AR 621).

13

Plaintiff additionally indicated that in 2001 he became more active socially because it removed the heaviness he felt when being isolated (AR 168). He also acknowledged that he went to a karaoke bar with his wife on Friday nights (AR 621). Although he reported "wild thoughts" on two occasions, he denied suicidal ideation or severe depression and could not give examples of his "wild thoughts" (AR 202, 203). Plaintiff was treated at different times with Prozac, Wellbutrin, Zoloft, and Paxil (AR 170, 199, 205, 617). By the time of the hearing, Plaintiff had not received any psychiatric treatment, other than medication, for three years, which kept him "pretty mellow" (AR 617).

Finally, I observe that Dr. Glover, the state agency psychiatrist, opined that Plaintiff's mental impairment was not severe (AR 377). Dr. Glover reviewed the medical evidence of record and concluded that Plaintiff's impairments did not meet or equal the severity requirements of Listing 12.04 because he exhibited only mild limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (AR 387). State agency physicians are experts in the field of social security disability evaluations, *see Social Security Ruling (SSR)* 96-6p, whose opinions are treated as expert opinion evidence. *See* 20 C.F.R. § 416.927(f)(2)(I). I find the ALJ's conclusion that Plaintiff failed to meet Listing 12.04 due to his mental impairments is supported by substantial evidence.

In addition to his argument with respect to the Listings, Plaintiff asserts that the ALJ erred in concluding that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Specifically, Plaintiff argues that the ALJ failed to point to any specific statements made by Plaintiff that are contradicted by his medical records. *See* Plaintiff's Brief, p. 11. The ALJ must give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986). Subjective complaints need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir. 1971). Where a claimant's testimony is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount claimant's complaints

14

without contrary medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *see Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987); *Akers v. Callahan*, 997 F. Supp. 648, 658 (W.D.Pa. 1998).

The ALJ in fact noted the Plaintiff's ongoing complaints of pain in his neck and shoulder, which Plaintiff repeated on several occasions (AR 20). In his opinion, the ALJ relied on both objective medical evidence and Plaintiff's own statements in passing on the Plaintiff's credibility (AR 20-22).

Plaintiff was released for full-time light duty work by Dr. Paczkoskie in December 2000 and continued to remain a good candidate for light duty in November 2001 (AR 270, 273). Dr. Paczkoskie also indicated that Plaintiff had "improved significantly" with respect to motion and strength (AR 235). In October 2001, Plaintiff reported his pain as being a 4 out of 10, and by November as a 3 out of 10 (AR 164-165). In December 2001, Dr. Paczkoskie noted that the Plaintiff had tested at a medium level of work for an eight-hour day, but was probably a good light duty candidate (AR 235). In April 2002, Plaintiff had full range of motion and good strength (AR 232). In December 2002, Dr. Paczkoskie again indicated that Plaintiff was at a light-duty status (AR 321).

From 2003 forward, Plaintiff had minimal treatment for his shoulder and neck pain. His last nerve block injection occurred in mid-2003 (AR 344). Plaintiff did not see Dr. Paczkoskie again until February 2004 at which time no further surgery was recommended (AR 213). Plaintiff was once again placed at a light-duty status (AR 213). As noted above, the state examining physician also concluded that the Plaintiff could perform a full range of light work (AR 367-376). I find the ALJ's credibility determination is supported by substantial evidence.

In a related argument, Plaintiff contends that the ALJ erred in determining that he had the residual functional capacity to meet the exertional demands of light work. *See* Plaintiff's Brief, p. 12. The ALJ found that the Plaintiff retained the residual functional capacity to perform light work, or work which requires lifting and carrying of up to 20 pounds occasionally, while standing and walking for approximately six hours in an eight-hour work day (AR 17). He further found that the Plaintiff could perform no climbing, crawling or balancing and no repeated

overhead reaching (AR 17). He assessed the Plaintiff as being incapable of work involving constant pushing or pulling or work which involved high stress, defined as work involving high quotas or close attention to quality production standards (AR 17). As discussed above, the ALJ relied on Plaintiff's statements and medical records to support his findings that his ailments were not severe enough to preclude him from light work. Plaintiff's own physician noted, on several occasions, that the Plaintiff was capable of light work (AR 235, 270, 273, 321, 367-376). The state agency physician concurred in that position (AR 367-376). The ALJ further relied on the Plaintiff's own statements that he was improving or had limited pain (AR 19-21). As a result, the ALJ concluded that Plaintiff was not disabled (AR 22-23).

Relatedly, Plaintiff claims that the ALJ erred in considering his eight months running a loader part-time for the railroad and four and one half months as a pharmaceutical delivery person, as evidence of his ability to work. *See* Plaintiff's Brief, p. 12. Plaintiff argues that these work attempts were unsuccessful pursuant to 20 C.F.R. §416.974(a). This regulation provides that when an individual is forced to stop his work after a short duration because of his impairment, the work is to be treated as an unsuccessful attempt. Under 20 C.F.R. § 404.1574(c)(1), an unsuccessful work attempt is measured by the duration and conditions of the claimant's work efforts. In order for a period of employment to be considered an unsuccessful work attempt, there must first be a significant break in the continuity of the claimant's work because of the impairment. *Id.* at § 404.1574(c)(2). The claimant must have stopped working or reduced his earnings below the substantial gainful activity earnings level because of his impairment or because of the removal of special conditions essential to the claimant's performance of the work. *Id* .

Where the work period is less than three months, it will be considered an unsuccessful work attempt if the claimant stopped working because of the impairment or the removal of special conditions which permitted him to work. *Id.* at § 404.1574(c)(3). If the work period is between three and six months, it will be considered an unsuccessful work attempt if it ended because of the impairment or removal of the special conditions and either (i) the claimant was frequently absent because of the impairment; (ii) the claimant's work was unsatisfactory because of the impairment; (iii) the claimant worked during a period of temporary remission of his impairment or (iv) the claimant worked under special conditions that were essential to his

performance and these conditions were removed. *Id.* at § 404.1574(c)(4).

At the hearing, the ALJ indicated that he was going to treat Plaintiff's four and one half months as a driver and eight months running a loader as unsuccessful work attempts because Plaintiff testified that he left those jobs due to his impairment (AR 613). In his opinion, however, the ALJ utilized those work attempts as evidence that the Plaintiff had the capacity to work (AR 20). Despite this mention of Plaintiff's unsuccessful work attempts in the ALJ opinion, I find that this error was harmless. The ALJ thoroughly supported his assessment that the Plaintiff was capable of light work with a great many of the Plaintiff's medical records and his own reports. Additionally, Plaintiff's own doctor had cleared him to perform light work on numerous occasions throughout the record. Even without this mention of the Plaintiff's intermittent work attempts, the ALJ's determination is supported by substantial evidence.

Finally, Plaintiff argues that the ALJ erred in accepting the vocational expert's testimony because he was not "physically or educationally" able to perform the state jobs, and that those jobs were "few and far between" and normally "part time." *See* Plaintiff's Brief, p. 12-13. Plaintiff provided no evidence to refute the numbers provided by the vocational expert and did not challenge the credentials of the vocational expert at the hearing (AR 626).

The regulations provide that "work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical and mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b). The vocational expert testified that there were more than 100,000 ticket taker jobs in the national economy, more than 2,000,000 order clerk positions in the national economy, and more than 400,000 electronic worker positions in the national economy (AR 628). Plaintiff provides no evidence to counter these numbers or show that the jobs are in fact "few and far between." Nor does he provide evidence that he is "educationally" unable to perform these jobs. According to the expert testimony of the vocational expert, these jobs exist in significant numbers in the national economy and Plaintiff is qualified to perform them (AR 627-628). Therefore, without contradictory evidence, Plaintiff's argument is meritless.

## IV. CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID M. RUSSELL,<br><br>    Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 08-158 Erie |

**ORDER**

AND NOW, this 9th day of July, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 6] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 12] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, David M. Russell.

The clerk is directed to mark the case closed.

                                                    s/ Sean J. McLaughlin
                                                    United States District Judge

cm: All parties of record.